

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 02 C 50117 | **DATE** | 4/3/2003 |
| **CASE TITLE** | | Orange vs. Barnhart | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]     For the reasons stated on the attached memorandum opinion and order, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined in the attached memorandum opinion and order. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | APR - 4 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | 4/3/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| sp | courtroom deputy's initials | FILED-WD 03 APR -3 PM 4:22 CLERK U.S. DISTRICT COURT | sp | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

GERTRUDE ORANGE,

    Plaintiff,

    v.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 02 C 50117

Magistrate Judge
P. Michael Mahoney

03 APR -3 PM 4: 22
U.S. DISTRICT COURT CLERK
FILED-WD

## MEMORANDUM OPINION AND ORDER

Gertrude Orange, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on July 30, 2002. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I. BACKGROUND

Plaintiff filed for DIB on March 8, 1999, alleging disability since August 12, 1998. (Tr. 14). Plaintiff's application for benefits was denied on April 30, 1999. (Tr. 62). On June 25, 1999, Plaintiff filed a request for reconsideration. (Tr. 66). Plaintiff's request for reconsideration was denied on October 28, 1999. (Tr. 67). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on December 23, 1999. (Tr. 71). Plaintiff appeared, with counsel, before an ALJ on July 27, 2000. (Tr. 36). In a decision dated September 27, 2000, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 19). On November 30, 2000, Plaintiff requested

a review of the ALJ's decision by the Appeals Council. (Tr. 10). On January 24, 2002, the Appeals Council denied Plaintiff's request for review. (Tr. 7-8).

## II.    FACTS

Plaintiff was born on June 9, 1949 and was fifty one years old at the time of her July 27, 2000 hearing before the ALJ. (Tr. 40). Plaintiff has completed her education through the eighth grade, although she apparently attended the ninth grade but did not complete it. (Tr. 40-41). Plaintiff alleges that she can read but cannot write very well because she cannot spell. (Tr. 41). At the time of the hearing, Plaintiff, married with three older children, was living with her husband. (Tr. 40).

Plaintiff alleges disability since August 12, 1998. (Tr. 41). In December 1999, the week prior to Christmas, Plaintiff worked through Manpower, a placement agency. (*Id.*). Plaintiff only performed warehouse work through Manpower for one week because she was injured on the job. (*Id.*).

Prior to Manpower, in 1998, Plaintiff was a machine operator at New Breathe through West Personnel. (Tr. 42). Plaintiff's job at New Breathe involved standing and lifting items under twenty pounds. (Tr. 42-43). Plaintiff's job at New Breathe lasted only three months because Plaintiff injured both her shoulders on the job. (Tr. 43). In 1995, prior to her job at New Breathe, Plaintiff worked for Community Care System. (Tr. 41). When asked what Plaintiff did at Community Care System, Plaintiff responded "[h]ome care." (Tr. 42). Later in her testimony, Plaintiff elaborated on her responsibilities when she stated she would help older patients with their medication, assist patients with their grocery shopping, and once a week assist with laundry. (Tr. 44). Plaintiff's responsibilities at Community Care System did not require her to lift anything above twenty pounds. (*Id.*). Plaintiff's job at Community Care System lasted two years and ended because of medical

2

reasons. (*Id.*). Specifically, Plaintiff stated her medical reasons consisted of a combination of things including problems with her back and personal illness. (*Id.*).

Plaintiff's physical problems are many. Plaintiff indicated that her primary problems stem from shoulder surgery on both shoulders and her back injury. (Tr. 44). In March 1999 Plaintiff had shoulder surgery on her right shoulder, followed by months of treatment, and then in June 1999, Plaintiff had shoulder surgery on her left shoulder. (Tr. 44-45). As a result of these surgeries, Plaintiff testified that she is unable to do much lifting or reaching over her head. (Tr. 44). Additionally, Plaintiff is unable to walk very far or stand very long because of nerve problems with her left leg, which was a result of her back injury. (Tr. 45). Specifically, Plaintiff testified that before her back injury, in December 1999, she was able to walk twenty blocks with no problem and now it takes Plaintiff one hour to walk six blocks. (*Id.*). Plaintiff also indicated she can stand only ten or twenty minutes before she must sit because of her back pain and she is unable to climb stairs without experiencing pain. (Tr. 47). Finally, Plaintiff cannot stoop or bend because she is unable to straighten herself out after bending or stooping due to her back pain. (*Id.*). To combat the pain, Plaintiff testified she takes Naprosyns four times daily in addition to aspirin. (Tr. 47-48).

Plaintiff's day to day activities are limited because of her pain. Plaintiff indicated that, although she does take care of things around the house, she does those activities "slowly" and "little by little." (Tr. 49). Plaintiff indicated that she has problems cleaning the house because it is painful to go up and down the stairs. (*Id.*). Additionally, although Plaintiff testified she has problems reaching over her head, she indicated she is able to dress herself with no help. (Tr. 50).

Vocational expert, Lee Knutson, appeared before the ALJ at Plaintiff's July 2000 hearing. (Tr. 55). The ALJ directed Mr. Knutson to assume an individual with Plaintiff's vocational

3

characteristics and the following limitations: the "individual ... being right hand dominant ... and being of the age of 51 years. Having a 9th grade education as well as limited ability in spelling[,]" and having the residual functional capacity ("RFC") for "light work with the restriction against overhead lifting." (Tr. 56). Mr. Knutson, in response, indicated that a person with such limitations could return to some of her machine operator positions, which Mr. Knuston stated ranged from unskilled to semiskilled and light to medium, and she could also perform the job of a homemaker, unskilled and light. (*Id.*). When asked to assume the hypothetical person was further limited to standing only ten to twenty minutes at a time and being able to walk only six blocks, Mr. Knutson stated that such an individual would be able to "do some machine operator positions with a sit/stand option, which would significant [sic] reduce the number that she could do." (*Id.*). Specifically, in the local economy, Mr. Knuston indicated there are fifteen thousand (15,000) machine tenders or machine operators that are in the light category, with the number reduced by 60% because of the sit/stand option. (Tr. 57). Additionally, with such limitations, the homemaker position would be eliminated. (Tr. 57).

In terms of other employment, Mr. Knutson indicated that because of Plaintiff's limitations she could probably perform sedentary positions such as an information clerk, but due to the problems with her shoulders, Plaintiff would not be able to do most assembly positions or most machine tending positions. (*Id.*). Additionally, because of her standing restrictions, Plaintiff would be eliminated from many light work jobs because they require Plaintiff to be on her feet. (*Id.*). Overall, Mr. Knutson indicated that "there would be very few jobs that [Plaintiff] could do." (*Id*) However, Mr. Knuston did indicate Plaintiff could probably perform the duties of receptionist/ information clerk (6,000 jobs in Chicagoland area) where she was able to sit/stand at her discretion. (*Id.*).

### III.  **MEDICAL HISTORY**

On August 16, 1999, Plaintiff filled out the Bureau of Disability Determination Services Activities of Daily Living Questionnaire. (Tr. 119). When asked about whether Plaintiff performs certain activities and, if so, how often, Plaintiff responded "some" to driving, reading, going to church, watching t.v., talking on the phone, paying bills, and going out to eat. (Tr. 121). However, Plaintiff also indicated that she feels pain in her shoulder during all those activities. (*Id.*). Plaintiff responded "rarely/never" to watching children, fixing things, playing cards, having hobbies, going to sports events, talking to neighbors, volunteering, going to movies, or going to school. (*Id.*).

The earliest medical record available to the Magistrate Judge is dated August 28, 1998. (Tr. 147). On that date, Plaintiff saw therapist Karen K.[1] ("Karen")of the Paulson Rehab Network. (*Id.*). Karen indicated Plaintiff had anterior pain and crepitus in both shoulders with a pain intensity of 3-10 out of 10 in her left shoulder and a pain intensity of 7-9 out of 10 in her left shoulder. (*Id.*). The objective evidence revealed flexion of one hundred forty degrees and one hundred forty five degrees in her right and left shoulder respectively. (*Id.*). The report also indicated extension of thirty seven degrees in Plaintiff's right shoulder and extension of forty four degrees in her left. (*Id.*). Plaintiff's abduction was one hundred seventy degrees in her right shoulder and one hundred forty five degrees in her left. (*Id.*). Karen indicated Plaintiff's rehab potential was "good" and recommended continued treatment. (*Id.*).

Plaintiff saw Karen again on September 10, 1998. (Tr. 146). Karen reported that Plaintiff felt no pain in her left shoulder but had continued pain in her right. (*Id.*). The objective evidence revealed flexion of one hundred fifty degrees in Plaintiff's right shoulder, which was a ten degree

---

[1] Karen's last name is not legible.

5

increase from Plaintiff's August 28, 1998 visit, and flexion of one hundred seventy five degrees in Plaintiff's left shoulder, which was a thirty degree increase from Plaintiff's August 28, 1998 visit. (*Id.*). Plaintiff's extension in her right shoulder increased three degrees, while the extension in her left shoulder remained the same. (*Id.*). The only noted decrease from Plaintiff's August 28, 1998 visit was her forty four degree decrease in abduction of her left shoulder. Plaintiff's abduction in her right shoulder increased thirty five degrees from her August 28, 1998 visit. (*Id.*). Karen again recommended continued treatment as it appeared Plaitniff's rehab potential was "good." (*Id.*).

Plaintiff saw Karen a week later on September 17, 1998. (Tr. 145). Karen reported that Plaintiff denied any pain in her left shoulder but did note a "popping" when Plaintiff performed certain motions with her shoulder. (*Id.*). Plaintiff continued to note pain in her right shoulder, but the pain intensity decreased to a 3 out of 10. (*Id.*). Plaintiff's objective medical evidence did not change from the findings on September 10, 1998. (*Id.*).

Plaintiff saw Karen again on September 25, 1998. (Tr. 144). The September 25, 1998 makes no reference to Plaintiff's left shoulder; rather, the report focuses on Plaintiff's right shoulder. (*Id.*). Karen reported Plaintiff has pain that radiates throughout her shoulder when she reaches forward or when she drives. (*Id.*). Plaintiff's pain intensity in her right shoulder was a 3-5 out of 10. (*Id.*). The medical evidence revealed Plaintiff's flexion was one hundred fifty one degrees and her abduction was one hundred forty degrees. (*Id.*). Karen's assessment of Plaintiff indicated that Plaintiff was showing slow improvement but that her rehab potential remained "good." (*Id.*).

Plaintiff saw Karen again on September 30, 1998 and November 13, 1998 (Tr. 142-143). Karen's reports indicated no change in Plaintiff's subjective or objective medical evidence from prior medical reports. Plaintiff continued to have no pain in her left shoulder, although there was

6

"popping," but Plaintiff did continue to have pain in her right shoulder. (*Id.*). Plaintiff's last therapy session with Karen was on November 13, 1998.

On October 19, 1998, Plaintiff saw Guido Marra, M.D., of Loyola University Health System, Loyola University. (Tr. 170). In terms of background, Dr. Marra reported Plaintiff came to him with complaints of bilateral shoulder pain, with the right being worse than the left. (Tr. 173.). Dr. Marra reported that, according to Plaintiff, she hurt her shoulder operating a machine and lifting heavy bags, in which she had to move the bags from her right arm to her left. (*Id.*). Because of the repetitive nature of moving the bags from arm to arm, Plaintiff alleged she began to develop left shoulder pain, and compensated by using her right arm more. (*Id.*).

Dr. Marra reported that his physical examination of Plaintiff revealed no gross atrophy in either Plaintiff's right or left shoulder. (Tr. 172). Plaintiff demonstrated that she could elevate her shoulder in the scapular plane to one hundred eighty degrees. (*Id.*). At an external rotation of zero degrees, Plaintiff's abduction was sixty degrees. (*Id.*). At ninety degrees, Plaintiff's external rotation was seventy degrees. (*Id.*). Internal rotation of Plaintiff's right shoulder was approximately to L1. Dr. Marra reported Plaintiff's left shoulder demonstrated the same rotation except that the internal rotation of the left shoulder was to T10. (*Id.*).

Plaintiff's crossbody abduction revealed some slight limitation in posteriro capsular tightness in the right shoulder, while the left shoulder did not demonstrate this. (*Id.*). Dr. Marra further reported that Plaintiff was point tender over the anterior aspect of her acromium and greater tuberosity. Plaintiff did not have any AC joint tenderness in her right shoulder but did demonstrate some mild tenderness in her left shoulder over her greater tuberosity. (*Id.*). Plaintiff's Speed's and Yurgeson's tests were negative bilaterally. (*Id.*). Plaintiff had a positive impingement sign on both

sides, with the right being worse than the left. (*Id.*). Plaintiff had a positive arc of pain on the right side and some subacromial crepitations that were not present on her left side. (Tr. 171).

In regards to strength testing, Dr. Marra reported Plaintiff demonstrated 4/5 strength testing in the right arm in abduction, external rotation and internal rotation, and was rate 5-/5 in abduction, external rotation and internal rotation in her left shoulder. (*Id.*). Plaintiff had no evidence of an apprehension sight, and did not have any increased glenohumeral translation. (*Id.*). Plaintiff's cervical spine was examined, which demonstrated full range of motion, with a negative Spurling's test. X-rays of Plaintiff's shoulders revealed no evidence of any calcific deposits in either shoulder. (*Id.*). However, there was evidence of a Type II acromium in both shoulders. (*Id.*). The X-rays further indicated no evidence of AC arthritis in either shoulder. (*Id*)

Dr. Marra ultimately assessed Plaintiff as suffering from impingement syndrome. (*Id.*). Dr. Marra, during this visit, injected corticosteroids and a local anesthetic in Plaintiff's right shoulder. (*Id.*). Dr. Marra reported that after approximately five minutes most of Plaintiff's symptoms were alleviated. Dr. Marra then prescribed physical therapy to work on Plaintiff's posterior capsular stretch and rotator cuff strengthening below the horizontal. (*Id.*).

Plaintiff saw Dr. Marra again on November 16, 1998. (Tr. 169). Dr. Marra reported Plaintiff's symptoms had improved, especially in her right shoulder. (*Id.*). A physical examination of Plaintiff revealed no evidence of any atrophy in either shoulder and an active and passive range of motion in both shoulder of one hundred eighty degrees. (*Id.*). Also in both shoulders, Dr. Marra reported Plaintiff's external rotation was to ninety degrees and her internal rotation was to T12. (*Id.*). On her right side, Dr. Marra noted Plaintiff did not have an impingement sign; however, on the left side, Dr. Marra noted Plaintiff did have a mild impingement with some mild subacromial

8

crepitation. (*Id.*). Dr. Marra recommended continued physical therapy and increased her work restrictions to include lifting twenty five pounds but no repetitive overhead activity. (*Id.*).

Plaintiff returned to see Dr. Marra on December 14, 1998. (Tr. 168). Plaintiff indicated to Dr. Marra that her increased work restrictions, from five pounds to twenty five pounds, had caused her increased pain in her shoulders, especially the right shoulder. (*Id.*). Dr. Marra's physical examination of Plaintiff revealed that both shoulders had forward elevation to one hundred eighty degrees actively and passively. (*Id.*). External rotation was eighty degrees with the arms abducted. (*Id.*). Plaintiff's right shoulder had a positive impingement sign, a positive impingement reinforcement test and a negative AC joint pain. (*Id.*). Plaintiff's left shoulder had a negative impingement sign, a negative impingement reinforcement test, but pain at the AC joint. (*Id.*). Strength testing revealed 5/5 strength in forward elevation, 5/5 strength in external rotation, and a negative liftoff sign. (*Id.*). Speed's test and Yurgeson's test were negative as was the O'Brien test. (*Id.*). Dr. Marra recommended Plaintiff obtain a bilateral MRI of her shoulder to rule out rotator cuff pathology. (*Id.*).

On December 17, 1998, Plaintiff saw Richard I. Angell, M.D. of the Dreyer Medical Clinic. (Tr. 174). Plaintiff's objective medical evidence revealed no acute injuries and very minimal degenerative changes of the AC joints. (*Id.*). Plaintiff had a full range of motion of the left shoulder with very minimal pain, but Dr. Angell did note some popping and crepitation at about one hundred twenty degrees of abduction and about one hundred thirty degrees of forward flexion. (*Id*). Plaintiff's right shoulder had a painful arc at between one hundred ten and one hundred fifteen degrees of forward flexion to about one hundred forty degrees. (*Id.*). Dr. Angell also noted that Plaintiff's extension, internal rotation and external rotation were all normal. (*Id.*). As of December

9

17, 1998, Dr. Angell opined that Plaintiff had rotator cuff tendinitis and had not responded well to conservative care. (*Id.*). Also, Dr. Angell reported that he did not believe Plaintiff could lift over five to ten pounds at her stage of treatment. (*Id.*).

Although not documented in her medical record, Plaintiff apparently had a MRI of both shoulders done between December 1998 and February 1999. (Tr. 175). Richard Guger, Account Representative for Specialty Risk Services, wrote a letter to Ronald Silver, M.D., of Midwest Orthopaedics, on February 19, 1999. (*Id.*). In that letter, Mr. Guger stated Plaintiff "recently underwent an MRI of both shoulders which indicated tears[,]" and that Plaintiff "is scheduled for surgery in April."[2] (*Id.*).

On March 5, 1999, Dr. Silver wrote Mr. Guger back regarding Plaintiff. (Tr. 224). In his letter, Dr. Silver indicated that he had examined Plaintiff and found both Plaintiff's shoulders to be tender over the anterolateral aspect of the humeral heads. (*Id.*). Further, Dr. Silver wrote he found no ecchymosis, abrasions, soft tissue masses or soft tissue swelling. (*Id.*). Plaintiff's range of motion, according to Dr. Silver, bilaterally was quite limited with slightly more range of motion in her left shoulder. (*Id.*). Plaintiff was limited to approximately ninety degrees in forward flexion in her right shoulder whereas in her left shoulder Plaintiff was between ninety five and one hundred degrees. (*Id.*). Plaintiff's impingement sign was positive bilaterally. (*Id.*). Dr. Silver also discussed Plaintiff's MRI which revealed the possibility of small full-thickness tears of the supraspinatues tendon in both shoulders. (Tr. 225). In concluding, Dr. Silver stated "[i]t is my experience that with these very small rotator cuff tears as noted on MRI there is a certain degree of inaccuracy present."

---

[2] In a subsequent letter dated February 22, 1999, Stephanie Farrell, Nurse Care Manager, indicated in her letter to Mr. Guger that Plaintiff's right shoulder surgery was scheduled for April 7, 1999 and that her left should surgery was scheduled three months after her right. (Tr. 179).

(*Id.*). Dr. Silver ultimately recommended Plaintiff obtain arthrograms of her shoulders to rule out full-thickness tears, because if present, Plaintiff would require rotator cuff repair.[3] (*Id.*).

On March 12, 1999, Dr. Silver wrote to Mr. Guger informing him that Plaintiff's arthrograms did not indicate full-thickness rotator tears in either shoulder. (Tr 223). As a result of this, Dr. Silver indicated Plaintiff can be treated with arthroscopic subacromial decompression in both shoulders, which should diminish her recovery time and disability. (*Id.*).

On March 29, 1999, Dr. Silver performed an arthroscopic subacromial decompression with partial anterior acromioplasty, coracoacromial ligament transsection, subacromial synovectomy, a rotator cuff debridement, and an arthroscopic distal clavicle resection on Plaintiff at St. Francis Hospital of Evanston. (Tr. 189). On April 7, 1999, one week after Plaintiff's arthroscopic subacromial decompression, Dr. Silver wrote to Mr. Guger that Plaintiff was doing very well. (Tr. 222). Dr. Silver indicated that after only one week, Plaintiff already had ninety degrees of active motion and approximately one hundred thirty degrees of passive flexion. (*Id.*). On May 5, 1999, Dr. Silver, in a letter to Mr. Guger, wrote "I am pleased to report that [Plaintiff] now has full flexion to 180 degrees ... [and] [h]er lateral abduction is to 90 degrees."(Tr. 221).

On May 7, 1999 Plaintiff saw Gabrielle Hayes, a physical therapist, of Healthsouth. (Tr. 211). Ms. Hayes reported Plaintiff's right shoulder flexion was one hundred thirty eight degrees and her left shoulder flexion was one hundred twenty eight degrees. (*Id.*). Plaintiff's right extension was thirty seven degrees and her left extension was thirty three degrees; her right abduction was eighty three degrees and her left abduction was one hundred degrees; and her external rotation was sixty

---

[3] On March 10, 1999, Joel E. Leland, D.O. of the Advanced Medical Imaging Center, performed an arthrogram of Plaintiff's left and right shoulder. (Tr. 176). Dr. Leland reported no evidence of a rotator cuff tear in either shoulder.

four degrees in her right shoulder and forty three degrees in her left. (*Id.*). Ms Hayes assessed Plaintiff has having pain and swelling around her right shoulder secondary to recent surgery and limited range of motion in her right shoulder. (*Id.*). Additionally, Ms. Hayes indicated Plaintiff had poor scapular stability in her right shoulder with general weakness. (*Id.*).

Plaintiff saw Dr. Silver again on June 2, 1999 and July 14, 1999. (Tr. 220 and 219 respectively). In his June 2, 1999 letter to Mr. Guger, Dr. Silver indicated Plaintiff's "lateral abduction has now increased to almost full range of motion." (Tr. 220). In his July 14, 1999 letter, Dr. Silver wrote Plaintiff's "range of motion is now full, on her right side. She will work on strengthening over the next four weeks." (Tr. 219).

As a final note, although Plaintiff makes some references to a back injury, there is no medical evidence to support a back injury. Plaintiff's medical records currently before the Magistrate Judge only provide evidence to support shoulder problems.

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389,

12

399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[4] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe

---

[4]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

impairment.[5]  A severe impairment is one which significantly limits the claimant's physical or

mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age, education,

and work experience are not considered in making a Step Two severity determination.  20 C.F.R.

§ 404.1520(c).  If the claimant suffers from severe impairment, then the inquiry moves on to Step

Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III,

Part 404, Subpart P, Appendix 1.  The listings describe, for each of the major body systems,

impairments which are considered severe enough *per se* to prevent a person from doing any

significant gainful activity. 20 C.F.R. §§ 404.1525(a).  The listings streamline the decision process

by identifying certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*,

476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent

to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the

inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional

capacity allows the claimant to return to past relevant work.  Residual functional capacity is a

measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a).

Although medical opinions bear strongly upon the determination of residual functional capacity, they

are not conclusive; the determination is left to the Commissioner, who must resolve any

discrepancies in the evidence and base a decision upon the record as a whole.  20 C.F.R. §

---

[5]The claimant need not specify a single disabling impairment, as the Commissioner will
consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c).  For
syntactic simplicity, however, this generic discussion of the Commissioner's decision-making
process will use the singular "impairment" to include both singular and multiple impairments.

404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

**VI.    ANALYSIS**

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on September 27, 2000. (Tr. 16).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000). The ALJ indicated Plaintiff earned only five hundred eleven dollars and thirty eight cents in 1999, which is not considered disqualifying substantial gainful activity. (*Id.*).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from obesity and musculoskeletal impairments involving her shoulders. (Tr. 17). The ALJ also noted that although Plaintiff alleges a back impairment, the medical record does not establish a severe impairment other than her shoulders. (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 17). The ALJ found that the medical record is not convincing that Plaintiff had impairments that

prevented her from working for any twelve month period. (*Id.*). Although Plaintiff did have bilateral shoulder impairments, the ALJ found those impairments did not preclude light work not requiring sustained overhead lifting. (*Id.*). Thus, the ALJ found Plaintiff's impairments did not meet any listing, such as 1.13 in Appendix 1. (*Id.*).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff could perform past relevant work. (Tr. 18). In coming to this conclusion, the ALJ first had to determine Plaintiff's RFC. In so doing, the ALJ evaluated Plaintiff's subjective complaints using factors in SSR 96-7p and 20 C.F.R. §404.1529(c) because "symptoms sometimes suggest a greater severity of impairment than the objective medical evidence alone." (Tr. 17-18). The ALJ found Plaintiff's subjective symptom testimony generally "credible" but also noted that Plaintiff's testimony revealed that her impairments do not compromise her ability to perform a significant range of light work for any period even approaching twelve months. (Tr. 18). Specifically, the ALJ found her shoulder conditions precluded only sustained overhead lifting or lifting more than twenty pounds occasionally or ten pounds frequently. The ALJ also noted that Plaintiff's obesity was not sufficient to compromise her ability to perform light work, as reflected in Plaintiff's activities of daily living, doing seasonal work at Christmas, and caring for her mother in her home since June 2000. (*Id.*).

Plaintiff makes two arguments against the ALJ's ultimate determination. First, Plaintiff argues that the ALJ's finding that Plaintiff's testimony was generally credible results in a finding of

18

disability at age 50. (Pl's Mot. to Reverse the Final Decision of the Comm'r at 7). Second, Plaintiff argues the Government's position was not substantially justified. (*Id*. at 8).

First, the Magistrate Judge will address Plaintiff's argument that the ALJ's finding Plaintiff's testimony generally credible should result in a finding of disability at age 50. Plaintiff first notes that the ALJ stated in his decision that "[t]he [Plaintiff's] testimony, including that of activities, was generally credible but not indicative of limitations that are disabling, consistent with probative testimony from the vocational expert, including that based on a crediting of the [Plaintiff's] testimony." (*Id*. at 6)(citing Tr. 19). Next, Plaintiff points out that the vocational expert testified that if Plaintiff's testimony was credited, the Plaintiff could perform only sedentary jobs. (*Id*.) (citing Tr. 57). Thus, Plaintiff argues, because the ALJ found Plaintiff's past work to be light work unskilled to semi-skilled, at age 50 Plaintiff does not have to perform unskilled sedentary work, and vocational rule 201.19 would direct a finding of disabled. (*Id*.).

In order to fully understand Plaintiff's argument, the Magistrate Judge looks to §200.00. 20 C.F.R. Pt. 404, Subpt. P, App. 2. Section 200, titled *Introduction* states, in pertinent part:

> (a) The following rules reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with severe medically determinable physical or mental impairments(s) is not engaging in substantial gainful activity and ***the individuals's impairments(s) prevents the performance of his or her vocationally relevant past work.*** They also reflect the analysis of the various vocational factors (i.e. age, education, and work experience) in combination with the individual's residual functional capacity (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work) in evaluating the individual's ability to engage in substantial gainful activity in other than his or her vocationally relevant past work. Where the finding of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a

particular rule, the rule directs a conclusion as to whether the individual is or is not disabled.

(emphasis added). Therefore, it appears for Plaintiff to be found disabled under §201.19, the ALJ would have needed to first conclude that Plaintiff could not perform past relevant work; however, the ALJ determined just the opposite– that Plaintiff could perform past relevant work. Allegedly then, Plaintiff is not only arguing for a finding under 201.19, but also arguing, as Plaintiff must, that the ALJ's determination is not correct. The Magistrate Judge disagrees.

In support of the ALJ, the Magistrate Judge looks first to the testimony of the vocational expert. Although initially clear, the vocational expert's testimony gets a bit confusing towards the end.

> ALJ: I would like you to assess the vocational outlook for an individual having the same work history that you just summarized for [Plaintiff] and being right hand dominant as she is, and being of the age of 51 years. Having a 9th grade education as well as limited ability in spelling. If I were to find that the hypothetical person has the residual functional capacity for light work with the restriction against overhead lifting, could the person return to any past work?

> VE: She could return to some of her machine operator positions, and she could do that homemaker job. That position – the light homemaker position.

> ALJ: All right, sir, now for my second question. If I were to find that the hypothetical person is limited to standing to 10, 20 minutes at a time, and in walking, 6 blocks. Would your answer change, if so, what would your answer be?

> VE: She would be able to do some – she would be able to do some machine operator positions with a sit/stand option, which would significant [sic] reduce the number that she could do. The homemaker positions would be eliminated.

> ALJ: All right, regarding machine operator jobs with a sit/stand

option, hwo many would there be in the national economy or and the local economy?

VE: In the local economy, I have 15, 000 machine tenders or machine operators that are in the light category. If I reduce that by 60% to put the sit/stand option –

ALJ: As my last question. If I were to fully credit the testimony at the hearing, ask you if you accept that as an accurate description of the hypothetical person's capabilities and limitations, would that give you sufficient information to form an opinion as to the vocational outlook, and if so, what would that opinion be?

VE: Out of a work force of Chicago area of 9 county Chicago and 3.9 million numbered jobs that she could do, would be substantially reduced. She probably – she would be able to perform in a sedentary position as an information clerk, but due to the problems with her shoulders, upper arms, she really wouldn't be able to do most assembly positions or most machine tending positions. Standing restrictions would eliminate a lot of light jobs that do not require a lot of lifting, but do require being on their feet. So, there would be few jobs that she could do. Basically like reception, information clerk where you can sit and stand at your own discretion.

ALJ: And how many of those jobs would there be?

VE: I have 6,000 of these jobs in the 9 county and Chicago (inaudible) statistical area.

When asked to fully credit Plaintiff's testimony by the ALJ, the vocational expert gave an answer

that indicated Plaintiff would be able to perform some sedentary jobs and also, apparently, some light

work jobs. The vocational expert put forth the jobs of a receptionist and an information clerk but

did not state whether those jobs were a few of the sedentary job Plaintiff could perform or two of the

"very few" light work jobs that Plaintiff could perform. (Tr. 57). Therefore, the Magistrate Judge

cannot accept Plaintiff's argument, and support for that argument based on the vocational expert's

testimony, that Plaintiff is disabled under 201.19 without looking to the medical record to determine

21

if substantial evidence existed to support the ALJ's finding that Plaintiff could perform past relevant work.

After reviewing the medical record, the Magistrate Judge finds substantial evidence exists to support the ALJ's finding that Plaintiff could perform past relevant work. Specifically, only one week after shoulder surgery, on April 7, 1999, Dr. Silver reported Plaintiff was doing very well and that after only one week Plaintiff had ninety degrees of active motion and approximately one hundred thirty degree of passive flexion. (Tr. 222). Then, approximately two months after Plaintiff's shoulder surgery, Dr. Silver indicated that Plaintiff "now has full flexion to 180 degrees ... [and] [h]er lateral abduction is to 90 degrees." (Tr. 221). By June 2, 1999, Plaintiff's lateral abduction had "increased to almost full range of motion," (tr. 220), and by July 14, 1999, Plaintiff had a full range of motion in her right shoulder. (Tr. 219). Additionally, while doctors initially limited Plaintiff to lifting five pounds, (tr. 151, 155-56, 160,163,166,170,181), with continued treatment Plaintiff's doctor increased that limit to twenty five pounds with no repetitive overhead lifting. (Tr. 169). Given Plaintiff's doctor's continued references to Plaintiff's improvements with treatment and Plaintiff's apparent full recovery in her right shoulder after surgery, it appears that substantial evidence exists to support a finding that Plaintiff can perform light work, as determined by the ALJ. Therefore, the Magistrate Judge will not disturb the deference given to the ALJ. See Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)(stating "[w]e have repeatedly stated that an ALJ's credibility determination will not be disturbed unless it is patently wrong."); Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994)(stating "[s]ince the ALJ is in the best position to observe witnesses, we usually do not impact credibility determinations on appeal so long as they find some support in the record and are not patently wrong.")

Substantial evidence exists to support the ALJ's finding that Plaintiff could have performed past relevant work and the Magistrate Judge finds no reason to disturb it. Therefore, the ALJ"s determination at Step Four of the Analysis is affirmed. Because the Plaintiff's RFC allows her to return to past relevant work, she is found not disabled and there is no reason to address Step Five.

## VII.  **CONCLUSION**

For the reasons stated above, the ALJ's decision to deny benefits to Plaintiff is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Plaintiff's Motion for Summary Judgment to the administrative record and pleadings is denied. Summary Judgment is granted to Defendant.

**ENTER:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 4/3/03

# United States District Court
## Northern District of Illinois
### Western Division

GERTRUDE ORANGE

v.

JO ANNE BARNHART

**JUDGMENT IN A CIVIL CASE**

Case Number: 02 C 50117

☐    Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■    Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment is denied. Judgement is granted in favor of the defendant and against the plaintiff.

Michael W. Dobbins, Clerk of Court

Date: 4/3/2003

Gale L. Graeff, Deputy Clerk